I respectfully dissent from the reversal of the attorney fee judgment entered by the trial court. My rationale consists of three elements. First, the contingency fee contract is legal, valid, binding, and not void. Second, the record supports the conclusion that, but for the services and participation of "James's attorneys," the tobacco defendants would have escaped liability to the State of Alabama entirely and would have avoided the payment of any compensation or settlement proceeds whatsoever to the State of Alabama. And, third, the sum awarded as the attorney fee by the trial court is reasonable and is, indeed, small in comparison with the multi-billion dollar recovery; and the amount and reasonableness were unchallenged in the trial court. A chronology of all the pertinent facts and an analysis of the relatively simple law will demonstrate that the judgment should be affirmed.
In 1994, the State of Mississippi sued the tobacco industry to recoup Medicaid funds spent for the treatment of tobacco-related illnesses. Thereafter, various other states filed litigation against the tobacco industry.
In May 1996, then Governor Forrest "Fob" James and then Attorney General Jeff Sessions appointed a task force to determine whether Alabama had a meritorious claim against the tobacco industry. In June 1996, the authorized agent and representatives of Philip Morris, Inc., R. J. Reynolds Tobacco Company, Brown and Williamson Tobacco Corporation, and Lorillard Tobacco Company sent to then deputy Attorney General (and now Attorney General) Bill Pryor a letter that explained their legal position regarding a "lack of merit of a Medicaid reimbursement suit against" them. On October 2, 1996, the task force, including Mr. Pryor, sent to Governor James a confidential and privileged report recommending that Alabama not file litigation against the tobacco industry because "[e]xpensive, risky, and lengthy litigation is not the proper vehicle to combat these public finance, health, and social issues." Report of the Task Force on Tobacco Litigation, 27 Cumb. Law Rev. 577, 652 (1996-97). The report of the task force was not released to the media.
In November 1996, the voters of Alabama elected Attorney General Sessions to the United States Senate, and, on January 2, 1997, Governor James appointed Bill Pryor to be Attorney General, to serve the remainder of Sessions's term. At the end of February or the beginning of March *Page 424 
1997, a reporter for the Birmingham News asked a representative of Attorney General Pryor whether the task force had submitted a report to the Governor and the Attorney General. Attorney General Pryor "contacted" Philip Morris, R.J. Reynolds, Brown and Williamson and Lorillard and informed them that a member of the news media had requested a copy of the report of the task force. He also informed them that the report was critical of the Medicaid reimbursement lawsuit filed against them by attorneys general of other states, and that, if he released the report, he would send them a copy of it. Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard informed Attorney General Pryor that they intended to defend all lawsuits vigorously. However, they assured Attorney General Pryor that, in the event of a settlement of any of the lawsuits, the citizens of Alabama "would not be disadvantaged by not having filed a similar suit."
On March 6, 1997, Attorney General Pryor gave a reporter for theBirmingham News a copy of the confidential and privileged report of the task force, and on March 7, 1997, Attorney General Pryor gave the same reporter an exclusive interview. Attorney General Pryor also sent a copy of the report of the task force to Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard. On March 10, 1997, Philip Morris, R. J. Reynolds, Brown and Williamson, and Lorillard filed a copy of the report of the task force as defensive material in the Mississippi Medicaid reimbursement lawsuit pending in the Supreme Court of Mississippi. On March 11, 1997, Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard contacted Attorney General Pryor, praised the report of the task force, and stated again that, in the unlikely event of settlement, Alabama would not be disadvantaged for failing to file a lawsuit. In reliance of the representation of Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard, Attorney General Pryor "publicly criticized the use of the judiciary to obtain financial advantages that may be best suited to the political or legislative arms of state and federal government," and stated that Alabama did not have a meritorious claim against the tobacco industry.
In June 1997, national tobacco settlement negotiations began between various state attorneys general and the tobacco industry. The negotiations culminated in a proposed national tobacco settlement agreement that required the approval of the United States Congress. However, the agreement died when Congress failed to approve the settlement. On July 3, 1997, the State of Mississippi announced a settlement of its lawsuit against the tobacco industry. That settlement was not subject to the approval of Congress. On August 25, 1997, the State of Florida announced a settlement of its lawsuit against the tobacco industry. That settlement was not subject to the approval of Congress. On August 27, 1997, Attorney General Pryor sought to obtain assurances from the tobacco industry that Alabama would be afforded the same benefits accorded those states that had filed lawsuits which were ultimately settled. On September 16, 1997, Attorney General Pryor entered into a tolling agreement with Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard. Only the provisions for the term of the Agreement appear in the record:
 "Term. This Agreement shall terminate on the earlier of (1) the adjournment of the second session of the 105th Congress without enactment of the Proposed Resolution or other global settlement which includes a requirement of a payment to the State of Alabama, or, in the event that the Proposed Resolution or other such global settlement is so enacted but fails to become law because of the failure of the President of the United States to sign it, the date upon which such failure to become law by virtue of such lack of such signature occurs; or (2) termination by either the Attorney General, or the Tobacco Defendants, *Page 425 
following sixty (60) days' written notice (if by the Attorney Generals, to all Tobacco defendant counsel of record in the Crozier and University of South Alabama cases; if by the Tobacco Defendants, by letter to the Attorney General). In the event of the failure of the 105th Congress to enact the Proposed Resolution or other global settlement, the parties may by prior mutual agreement extend the term of this Agreement." (Emphasis added.)
On January 16, 1998, the State of Texas announced a settlement of its lawsuit against the tobacco industry. That settlement did not require the approval of Congress. In the spring of 1998, new national tobacco settlement negotiations began. Alabama did not participate in the negotiations nor did Alabama have a representative on the negotiations team, although the chief deputy Attorney General consulted on a daily basis with the negotiations team.
In March 1998, Walter Byars became special counsel to Governor James. Byars worked with the Governor on proposed tobacco legislation and on identifying the options that Governor James and Alabama had to pursue a recovery from the tobacco industry. On April 15, 1998, Byars furnished Governor James with a legal opinion stating that the Governor had the authority to institute litigation against the tobacco industry. Byars recommended that the Governor direct Attorney General Pryor to file the litigation.
On April 27, 1998, the Alabama Legislature passed the Children First Trust Fund Act, § 41-15B-1 et seq., Ala. Code 1975 (Cum. Supp. 1999), which requires the Governor to "file any litigation necessary to effectuate the compelling interest of the State of Alabama to recover tobacco-related damages incurred by the state." § 41-15B-2(i), Ala. Code 1975. Governor James directed Byars to prepare a complaint against the tobacco industry. In June 1998, the Governor instructed Byars to find a group of attorneys to handle the litigation against the tobacco industry.[4]
On July 28, 1998, Byars presented Governor James with a proposed complaint on behalf of the State of Alabama against the tobacco industry. The complaint sought to recover money spent by Medicaid, Public Education Health Insurance Plan, State Employment Insurance Plan, other funds, and agencies to treat tobacco-related diseases or illnesses. Governor James tendered the complaint to Attorney General Pryor or his deputy and requested the Attorney General to file the complaint. AttorneyGeneral Pryor refused to file the complaint on behalf of the State ofAlabama.
Effective July 28, 1998, Byars entered into a contingency fee contract for legal services with the State of Alabama through a contract with Governor James. The contract provided that Byars was to recover money from third-parties whose tobacco products caused or may cause tobacco-related illnesses to recipients of health benefits funded by the state. The contract authorized Byars to associate other attorneys as long as the association of other counsel did not increase the amount of the fee. Byars associated Jere Beasley, E. Ted Taylor, Larry Morris, and Michael J. Evans (herein collectively called "James's attorneys").
Concerned by the Attorney General's failure to act, Governor James asked James's attorneys whether he could file a lawsuit against the tobacco industry. James's attorneys advised the Governor about a "tolling agreement" Attorney General *Page 426 
Pryor made with some tobacco companies and about the effect of the Attorney General's failure to have all tobacco companies sign the tolling agreement. While Governor James proposed to file a complaint against the tobacco industry immediately, Attorney General Pryor advised the Governor that such a filing would breach the tolling agreement, which would then cause the statute of limitations to bar any action by the State. Attorney General Pryor advised the Governor to wait to file the complaint until the tolling agreement expired, at the end of the 105th Session of Congress.
In November 1998, James's attorneys completed a final draft of the complaint against the tobacco industry. In an amended contingency contract executed on November 12, 1998, the Governor approved Byars's association of Beasley, Taylor, Morris, and Evans. The amended contingency fee contract contained the following provisions:
 "The Attorneys' claims and the Court's award of fees shall not exceed 7.00% of the total amount of recovery, which total amount shall include any monies received by the State of Alabama as a result of this litigation or any settlement of any claims asserted or which could have been asserted in this litigation, whether negotiated by the Governor, the Attorneys or any other party, including any and all damages of any type or nature whatsoever, plus out-of-pocket costs and expenses incurred by the Attorneys. Provided, if a proposed settlement is reached by the Attorney General without the Attorneys' substantial participation, no Attorneys' fees will be paid to the Attorneys.
 "This contract, including but not limited to the payment of fees, costs and expenses, shall be governed and controlled by the laws of the State of Alabama and the rules of the Alabama State Bar.
". . . .
 "The terms and commitments contained herein shall not be considered as a debt of the State of Alabama in violation of Article II, Section 213 of the Constitution of Alabama 1901, as amended by Amendment Number 26. If any provision of this contract shall contravene any statute or constitutional provision or amendment, then the conflicting provision shall be deemed null and void. Provided, however, Attorney[s] shall be entitled to recover the fees and expenses provided herein only from the recovered proceeds." (Emphasis added.)
Neither the original contingency fee contract nor the amended contingency fee contract was submitted to the Contract Review Permanent Legislative Oversight Committee. See §§ 29-2-41 and 29-2-41.2(b), Ala. Code 1975, hereinafter discussed.
That same day, November 12, 1998, because James's attorneys feared that Attorney General Pryor might have allowed the statute of limitations to run with regard to a major portion of the tobacco industry, including smokeless tobacco, James's attorneys filed the complaint they had prepared in the name of Governor James on behalf of the State of Alabama, immediately following the adjournment of the 105th Congress. The complaint specifically sued 28 tobacco product companies, including smokeless tobacco companies and one cigarette paper manufacturer. The complaint asserted various tort-based counts, including negligence, willfulness, outrage, AEMLD, and conspiracy.
Still later that same day, November 12, 1998, Attorney General Pryor filed a complaint against Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard only. The Attorney General's complaint sought damages for breach of contract, but did not seek any equitable relief. Attorney General Pryor's complaint alleged that Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard breached a contract by not including Alabama in the national tobacco settlement. *Page 427 
On November 17, 1998, James's attorneys amended their complaint to assert the same breach of contract. That same day, Attorney General Pryor tendered two settlement agreements to Governor James. One agreement settled the State's claims involving smoking tobacco and the other agreement settled the State's claims involving smokeless tobacco. The deadline to accept the settlement offers was November 20, 1998.
James's attorneys reviewed the agreements and objected to the inclusion of the attorneys in Blaylock v. The American Tobacco Company, Montgomery County Circuit No. CV-96-1508, a private class action, to receive payment of attorney fees from the settling tobacco defendants. James's attorneys also reviewed the tolling agreement between the Attorney General and Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard to determine whether the claims against some tobacco defendants were barred by the statute of limitations, because those tobacco defendants were not signatories to the tolling agreement.
Governor James refused to sign the settlement agreements because Alabama would receive only $3,000,000,000 or $700 per person, when Mississippi would receive $4,400,000,000 or $1,600 person and Minnesota would receive $6,100,000,000 or $1,300 per person. Because of the statute-of-limitations problems, however, James's attorneys advised the Governor to allow the Attorney General to accept the settlement agreements. Although unsatisfied with the amount of the settlement agreements, Governor James on November 20, 1998, empowered Attorney General Pryor to settle the litigation. Within one hour of receiving authority to settle the litigation, Attorney General Pryor discharged James's attorneys. He amended the settlement agreement, for Alabama only, to exclude the Blaylock case as the "tobacco settlement vehicle," and included the case that he had filed as the settlement vehicle. In Exhibit S to the Master Settlement Agreement, a listing of attorneys to be paid by the tobacco defendants, Attorney General Pryor stated that "`[t]he State of Alabama had no outside counsel.'" Exhibit S, however,does list the attorneys representing Blaylock as being entitled to receive an attorney fee.
On December 11, 1998, Attorney General Pryor, Blaylock, Philip Morris, and the other tobacco companies filed a joint motion for approval of the Master Settlement Agreement. They requested entry of a final consent judgment. On February 26, 1999, the trial court conducted a fairness hearing in the actions filed by Attorney General Pryor, Blaylock, and Governor James. At the fairness hearing, a representative of the Attorney General conceded that Governor James had authority to file the tobacco lawsuit and to hire attorneys to pursue that litigation. On March 3, 1999, the trial court entered a final consent judgment dismissing with prejudice all claims of the State. Likewise, the court dismissed without prejudice all claims in the Blaylock action. The trial court, sua sponte, entered a supplemental order, stating that it was appropriate to compensate James's attorneys for their efforts in the tobacco litigation and directing James's attorneys to file fee petitions.
On March 15, 1999, James's attorneys, except Jere Beasley, filed a joint petition for attorney fees and expenses to be paid by the tobacco defendants or, in the alternative, to be paid by the State. James's attorneys, except Beasley, submitted affidavits delineating, in hours and minutes, the time each spent on the litigation. They also listed the expenses they each incurred. Byars submitted 195.25 hours plus 20.75 hours for his paralegal and expenses of $4,411.51. Evans submitted 125.5 hours and expenses of $2,250. Taylor submitted 249 hours plus "staff time" of 115.25 hours and expenses of $3,682.35. Morris submitted 269.15 hours and expenses of $536. James's attorneys suggested a total fee of $1,939,357 plus expenses. *Page 428 
On March 17, 1999, Attorney General Pryor filed a response challenging the validity of the contingency fee contract on the ground that the contract had not been submitted to the Contract Review Permanent Legislative Oversight Committee. He argued also that James's attorneys were not entitled to a fee under the contract. The Attorney General did not, however, challenge the amount or reasonableness of the attorney fee sought.
On April 9, 1999, the trial court conducted a hearing on the joint fee petition. James's attorneys presented expert testimony from Fred D. Gray, Esq., and John Tabor, Esq. Gray and Tabor both testified regarding the fee petition, the attorney affidavits, the settlement agreements, and the reasonableness of the fee. They also testified about recovery underquantum meruit. Gray testified that a $2,000,000 fee was reasonable under contingency fee contract or under quantum meruit. Tabor testified that the $2,000,000 fee, as stated by Gray, was reasonable under the contingency fee contract or quantum meruit, but that he was prepared to testify in favor of a larger fee. Additionally, Jim Main and Byars both testified about the fee petition and the reasonableness of the requested fee. Attorney General Pryor did not call any witnesses or offer any evidence and did not cross-examine Gray and Tabor. He did cross-examine Main and Byars. Attorney General Pryor did not dispute or object to the amount of the attorney fee requested by James's attorneys and did not dispute or object to the amount of the attorney fee recommended Tabor and Gray. Attorney General Pryor did argue that James's attorneys were not entitled to an attorney fee because the contingency fee contracts were void and because they did not "substantially participate" in the tobacco settlement.
On May 7, 1999, the trial court entered an order stating, in pertinent part:
 "The Court has before it, and has considered, the Petition(s) for Attorneys' Fees and Expenses filed by [James's attorneys]; the accompanying affidavits and submissions of all [James's attorneys]; the original contingency fee contract and the amended contingency fee contract with the State; the ore tenus testimony and other evidence presented at a scheduled hearing on April 9, 1999, at 10:30 A.M., with the State of Alabama being represented by the Attorney General and the Deputy Attorney General; and the response of the Attorney General in opposition to the attorneys' fees.
". . . .
"FINDINGS AND CONCLUSIONS
 "The evidence is undisputed that the Attorney General had, for more than 1 1/2 years, advised Governor James that a settlement with the tobacco industry was imminent; however, the Attorney General's legislative efforts in Alabama and nationally were unsuccessful; and it was not until sometime after suit was filed by Governor James on behalf of the State of Alabama seeking equitable and tort relief, including damages and injunctive relief against promoting the sale of tobacco to minors, that the settlement agreement which included Alabama were offered to the State for execution as a part of a national settlement. Under the amended contingency contract between the State and [James's attorneys], fees and expenses were to be set by the Court, with a maximum of 7.00% of the total amount of recovery, which `shall include any monies received by the State of Alabama as a result of this litigation, whether negotiated by the Governor, [James's attorneys] or any other party, including any and all damages of any type or nature whatever, plus out-of-pocket costs and expenses incurred by . . . [James's attorneys]. Provided if a proposed settlement is reached by the Attorney General without [James's attorneys'] substantial participation, no attorneys' fee will be paid to the Attorneys.' *Page 429 
 "This contingency fee contract was in effect when the instant lawsuit was filed by Governor James on behalf of the State and at the time the settlement offer was made to the State of Alabama. [James's attorneys were] not afforded an opportunity to participate in the settlement negotiations with the tobacco defendants. Subsequent to filing this suit, the Attorney General received, and, on November 16 or 17, 1998, tendered to Governor James the proposed settlement agreements relating to smoking and smokeless tobacco for the approval of and execution by the Governor as provided in the Children First Fund Act, with a deadline of November 20, 1998. Governor James unsuccessfully requested an extension of 30 days to analyze the settlement proposals. Upon Governor James' refusal to sign the settlement agreements based on, in his opinion, the inadequacy of the settlement recovery, the consent to pursue or settle was given by Governor James to Attorney General Pryor on November 29, 1998. On that date, [James's attorneys] were notified by the Attorney General that their services were no longer required. `It is well established in Alabama that upon an attorney's discharge, the prior part performance of a contract entitles the attorney to recover for those services rendered.' Triplett v. Elliott, 590 So.2d 908, 910 (Ala. 1991). `[A] contingent fee client cannot wait until a favorable settlement offer has been received to discharge the lawyer. In that situation, the lawyer can recover on the contract if the discharge was without cause. See, Kaushiva v. Hutter, 454 A.2d 1373 (D.C.App. 1983).' Ala. State Bar Office of General Counsel Ethics Opinion, RO-92-17 (1992).
 "The Attorney General executed the settlement agreements on behalf of the State of Alabama but in lieu of the required signature of Governor James, attached Governor James' letter of consent for representation by the Attorney General. The Attorney General on behalf of the State of Alabama invoked the jurisdiction of this Court to consider and approve the settlement. This Court approved the settlement by its . . . Order entered March 3, 1999.
 "The Attorney General conceded that Governor James had the authority to file this lawsuit and to hire [James's attorneys], and the accuracy of the hours and fees submitted by [James's attorneys], yet offered no evidence to dispute these claims, but relied upon two legal contentions:
 "(1) That the contingency fee contract was [void ab initio] for failure to file the contract with the Contract Review Permanent Legislative Oversight Committee relying on Ala. Code § 29-3-41; however, that statute is not applicable to the instant contingency fee contract which was not a contract `to be paid out of appropriated funds.' Accordingly, the Court finds that the contingency fee contract for legal services to be provided by [James's attorneys] was not required to be filed with the Committee. As Governor James possessed statutory authority to enter into contracts for legal services to be performed by [James's attorneys], the contingency fee contracts were valid and were binding on the State of Alabama, at least until terminated by the Attorney General.
 "(2) That [James's attorneys] did not substantially participate in bringing about the settlement. The evidence is undisputed that [James's attorneys] made several substantial contributions to bringing about the settlement which constitute `substantial participation' by [James's attorneys]. The undisputed evidence is that the tobacco defendants did not agree to a settlement with Alabama until Governor [James's] lawsuit was filed; this lawsuit was instrumental in bringing about the tobacco settlement with Alabama; [James's attorneys] saved the State from a potential fee claim by attorneys representing plaintiffs in the Blaylock case; [James's attorneys] *Page 430 
advised Governor James to consent to the takeover of this litigation and the tobacco settlement by the Attorney General in order to permit settlement to be consummated by the Attorney General on behalf of the State; this litigation included both smoking and smokeless tobacco and sought equitable relief, including injunctive relief against promoting tobacco sales to minors, and presented the only claims by the State against smokeless tobacco defendants; and this litigation made the State potentially eligible for a share or a larger share of the Strategic contribution Fund to be awarded under the settlement agreements in proportion to each state's active participation. The significance of the instant tort litigation filed by Governor James was acknowledged by Counsel for the tobacco industry in their refusal to accept a release of the contract liability pursued by the Attorney General without a final release of liability based on the tort and equitable claims filed by Governor James. Based on the foregoing, the Court finds `substantial participation' by [James's attorneys] in bringing about the settlement approved by this Court.
 "The undisputed evidence presented by [James's attorneys], both by affidavits and submissions, and by the ore tenus testimony of fee experts Fred D. Gray, Sr., Esq., and John A. Taber, Esq., support the award, of an attorneys' fee to be shared among [James's attorneys] in the amount of $2 Million as reasonable on a contingency fee basis as provided in the contractual arrangements between the State and [James's attorneys], or based upon [quantum meruit] for services performed applying the factors set out in Peebles v. Miley, 439 So.2d 137 (Ala. 1983), and Brown v. State, 565 So.2d 585, 592 (Ala. 1990). There is no contradictory evidence.
 "The total recovery to be paid to the State of Alabama pursuant to the settlement agreement, without applying any inflation or other factors, is $3.037 Billion to be paid over 25 years, with a payment in the amount of $38,787,140 to be paid in 1999. The award of $2 Million as attorneys' fee is reasonable, representing only slightly more than 6/100ths of 1% (0.06%) of the total recovery, and 5.16% of the recovery to be paid in 1999 under the terms of the settlement.
 "Based upon the uncontradicted evidence and the applicable legal principles, the Court finds that [James's attorneys] are entitled to an attorneys' fee of $2 Million to be shared among [James's attorneys], plus out-of-pocket expenses and costs in the total amount of $11,160.36 as itemized.
"ORDER
 "Based on the foregoing, it is considered ORDERED, ADJUDGED AND DECREED that:
 "(1) [James's attorneys] be and they are hereby awarded and shall have and recover attorneys' fees in the amount of $2 Million, and reimbursement of costs and expenses in the total amount of $11,160.36, to be paid to [James's attorneys] out of the settlement amount of $38, 787,140 to be paid [to] the State of Alabama by the tobacco defendants;
 "(2) The tobacco defendants named as parties to this action, and who are parties to the settlement agreements be, and they are hereby directed to pay James's attorneys the sum of $2 Million as attorneys' fees and $11,160.36 as reimbursement of costs and expenses to be paid out of the amount set aside or designated for payment of settlement to the State of Alabama for the year 1999 in the amount of $38,787,140;
 "(3) [James's attorneys are] hereby granted a lien in the amount of $2,011,160.36 against the amounts held by the tobacco defendants, or their agents, for payment of the settlement installment of $38,787,140 to be paid to the State of Alabama in 1999 by the *Page 431 
tobacco defendants pursuant to the settlement agreements."
Section 29-2-40, Ala. Code 1975, created the Contract Review Permanent Legislative Oversight Committee. The responsibilities of the Committee are stated by § 29-2-41, Ala. Code 1975, as follows:
 "The committee shall have the responsibility of reviewing contracts for personal or professional services with private entities or individuals to be paid out of appropriated funds, federal or state, on a state warrant issued as recompense for those services." (Emphasis added.)
That same section also provides, in pertinent part:
 "Each contract shall be accompanied by an itemization of the total cost estimate of the contract. The department may, in lieu of the proposed contract, submit to the committee a letter of intent to contract. Such [a] letter of intent to contract shall indicate the contracting parties, the services to be performed, an itemization of the total cost estimate of the contract, and such other information as the department may deem pertinent to the committee review of the contract. The committee shall review and comment where necessary on any such contract or letter of intent to contract within a reasonable time not to exceed 45 days after the department has submitted the contract or letter of intent to contract to the committee. Any contract made by the state or any of its agencies or departments in violation of this section and without prior review by the committee of either the contract or the letter of intent to contract shall be void ab initio." (Emphasis added.)
Thus this section can operate to void only unreviewed contracts to be paid out of appropriated funds on state warrants
The term personal and professional services is defined in § 29-2-41.2
as including "independent contractor agreements as well as individual employment agreements." Subsection (b) of § 29-2-41.2 specifically governs contracts for employment of attorneys to provide legal services to the State or its agencies. That section provides:
 "Notwithstanding any other provisions of this article, all contracts for employment of an attorney to provide legal services, including contracts involving an attorney providing legal services under an agreement with the Attorney General, shall be reviewed by the committee. Provided, however, contracts for appointment of attorneys for the Department of Transportation for right of way condemnation cases are exempt from the provisions of this article."
The Attorney General argues that § 29-2-41.2 must be read by itself, not in pari materia with § 29-2-40 and § 29-2-41, and that § 29-2-41.2 voids ab initio the contingency contracts of James's attorneys. Section 29-2-41.2, read by itself, however, does not contain any void-ab-initio provision or, indeed, any sanction at all.
"The cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute. Gholston v. State, 620 So.2d 719 (Ala. 1993)." Ex parteState Dep't of Revenue, 683 So.2d 980, 983 (Ala. 1996). In determining legislative intent, "the entire Act must be examined and construed as a whole, and, if possible, every word in it given effect." McWhorter v.State Bd. of Registration for Professional Engineers Land Surveyors exrel. Baxley, 359 So.2d 769, 771 (Ala. 1978). Moreover, "[s]ections of the Code dealing with the same subject matter are in pari materia. As a general rule, such statutes should be construed together to ascertain the meaning and intent of each." Locke v. Wheat, 350 So.2d 451, 453 (Ala. 1977) (citations omitted). See also Tuders v. Kell, 739 So.2d 1069, 1072
(Ala. 1999), and Lambert v. Wilcox County Comm'n, 623 So.2d 727 (Ala. 1993).
Section 29-2-41.2 defines the term "personal and professional services" used in *Page 432 
§ 29-2-41 and includes contracts for legal services in that term. As already observed, the void-ab-initio provision is contained in §29-2-41, not § 29-2-41.2, which, if not construed in pari materia
with § 29-2-41, contains no penalty at all for failing to submit a contract for the legal services to the Contract Review Permanent Legislative Oversight Committee. The result is exactly the same if §§29-2-40, 29-2-41, and 29-2-41.2 are construed in pari materia, as obviously they should be, inasmuch as they all deal with the same subject matter: because the void-ab-initio sanction appears in the very same section that contains the language limiting its application to "contracts for . . . professional services with . . . individuals to be paid out of appropriated funds . . . on a state warrant," the void-ab-initio provision does not apply to any contracts not to be paid out of appropriated funds on a state warrant, like the contingency fee contracts here, which expressly state that James's attorneys' fee is to be paid out of "the recovered proceeds" of the tobacco case settlements.
The trial court correctly determined that the contingency fee contracts between James's attorneys and the State were not subject to review by the Contract Review Permanent Legislative Oversight Committee. Consequently, the contingency fee contracts are not void ab initio or void at all pursuant to §§ 29-2-40, 29-2-41, and 29-2-41.2 for lack of such review.
The amended contingency fee contract states that, "if a proposed settlement is reached by the Attorney General without the Attorneys' substantial participation, no Attorneys' fees will be paid to the Attorneys." Whether James's attorneys' services constituted "substantial participation" in the settlement is a factual question.
The State's argument that James's attorneys did not substantially participate in the settlement of the tobacco litigation is mistaken. Effective April 27, 1998, the Children First Trust Fund Act authorized Governor James only, unless he authorized the Attorney General to act, to pursue litigation against the tobacco industry. § 41-15B-2(i). The Children First Trust Fund Act prohibits the Attorney General from settling any litigation by an executive department or agency under the control of the Governor. Thus, after April 27, 1998, Attorney General Pryor could not reach a settlement with the tobacco industry unless Governor James authorized him to do so. Governor James did not authorize Attorney General Pryor to settle with the tobacco industry until November 20, 1998, when James's attorneys advised the Governor to authorize the Attorney General to accept the settlement offers because of statute of limitations problems resulting from the tolling agreement. Without the research by James's attorneys and their recommendation to the Governor, Attorney General Pryor would not have received the authority to accept the settlement agreements and, without the delegation of authority to settle, Attorney General Pryor could not have concluded the settlements. Moreover, in its order awarding the attorney fee and expenses to James's attorneys, the trial court found their substantial participation as a fact and supported that fact-finding with a detailed description of their participation.
In summary, the law does not invalidate the contingency fee contracts; the record amply supports the trial court's finding that James's attorneys substantially participated in the settlement of the litigation against the tobacco industry; and the State does not challenge either the amount or the reasonableness of the attorney fee, and the record supports the reasonableness of the fee. Thus, the judgment of the trial court awarding a $2,000,000 attorney fee plus costs to James's attorneys should be affirmed.
Cook, J., concurs. *Page 433 
[4] James Allen Main, Governor James's legal advisor and then executive secretary, testified that, in June 1998, Attorney General Pryor told Governor James that the statute of limitations against the tobacco defendants had run in May 1998 because, in May 1996, Attorney General Pryor had attended a meeting with other state attorneys general and then and there had acquired knowledge of the facts and theories of the fraud claims. Attorney General Pryor told the Governor that, if he filed suit against the tobacco defendants before the termination of the tolling agreement, then the State of Alabama would receive nothing.